**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**(MIAMI DIVISION)**
**www.flsb.uscourts.gov**

In Re:

APOSTOLIC ALLIANCE CHURCH                           CASE NO. 12-19619-AJC
OF THE LORD JESUS CHRIST, INC.,                     Chapter 11

        Debtor.

_____/

**OBJECTION OF SECURED CREDITOR CHURCH MORTGAGE INVESTORS, LLC.,**
**TO DEBTOR'S MOTION (1) FOR AUTHORITY TO SELL REAL PROPERTY FREE**
**AND CLEAR OF LIENS, CLAIMS AND INTERESTS, WITH LIENS TO BE**
**ATTACHED TO PROCEEDS OF SALE AND (2) TO SHORTEN NOTICE  (D.E. 36)**

**COMES NOW** Creditor Church Mortgage Investors, LLC. ("Church Mortgage") by and

through its undersigned counsel and files the following: *Objection of Secured Creditor Church*

*Mortgage Investors, LLC., to Debtor's Motion (1) for Authority to Sell Real Property Free and*

*Clear of Liens, Claims and Interests, with Liens to be Attached to Proceeds of Sale and (2) to*

*Shorten Notice* (D.E. 36) and in support states:

<u>**SUMMARY OF LEGAL ARGUMENT**</u>

The Debtor has proposed a sale of certain of its real property and improvements. The

proposed sale is to an entity known as South Florida RE Holdings, LLC., for a purchase price of

$835,000. Respondent Church Mortgage Investors, LLC., holds a first mortgage on the subject

real property and improvements. Prior to the Chapter 11 filing Church Mortgage obtained a final

judgment of foreclosure.

The Debtor's proposed sales contract with South Florida RE contains multiple

contingencies and is not in the best interest of the estate. By way of example, the Debtor and

proposed buyer will enter into a separate sale/lease back agreement requiring the Debtor to

1

borrow funds *from* the Buyer and provide the Buyer with a mortgage on separate property owned by the Debtor. The proposed Buyer requires multiple environmental studies over an extended period of time. The Buyer may freely rescind the agreement and obtain a full refund of its deposit.

Church Mortgage does not consent to the sale as it is presently proposed.  Prior to the filing of the instant objection Church Mortgage also presented the Debtor with a competing contract to purchase the property. The competing contract is for a greater amount with a prompt closing, without the multiple contingencies, and a prompt closing date. The Debtor has failed to present Church Mortgage's contract for consideration by the Court and creditors of the estate.

The Debtor's proposed sale to South Florida RE Holdings is not fair and equitable or in the best interests of the estate. There is no benefit to the estate because there will be no net proceeds.  Nor has the Debtor demonstrated that it has exercised sound business judgment by its failure to solicit higher and better offers. Therefore Church Mortgage requests that the Debtor's motion to for authorization to sell the subject property to South Florida RE be denied and the property offered at auction or other means as determined by the Court.

## STATEMENT OF THE FACTS

1.     Apostolic Alliance Church of the Lord Jesus Christ, Inc. ("Debtor") filed for relief under Chapter 11 of Title 11 of the United States Code on April 20, 2012. (D.E. 1). The Debtor is in possession of its assets and operates as a debtor in possession.

2.     The Debtor executed a promissory note in favor of Church Mortgage Investors, LLC., ("Church Mortgage"). The promissory note was secured by a first mortgage upon the Debtor's real property and improvements (the "Property") located at: 12720-40 S.W. 200th Street, Miami, Florida 33177-4818.

3.      The Debtor defaulted under the terms and conditions of the parties' promissory note and mortgage. On November 14, 2011 Church Mortgage filed a foreclosure action mortgage in proceedings styled: <u>Church Mortgage Investors, LLC vs. Apostolic Alliance Church of the Lord Jesus Christ, Inc. and Hernando Diaza</u>, In the Eleventh Circuit Court in and for Miami-Dade County, Florida, Case No. 11-37672 CA 31.

4.      On February 22, 2012 a Final Judgment of Foreclosure was entered by the Circuit Court of Miami-Dade County Florida in the sum of $834,435.80.

5.      Church Mortgage deferred scheduling a foreclosure sale of the Property while the Debtor continued to promise that it had a contract to sell the Property to an entity known as South Florida RE Holdings, LLC. ("South Florida RE").

6.      On August 9, 2012 the Debtor filed Debtor's Motion (1) For Authority To Sell Real Property Free And Clear Of Liens, Claims And Interests, With Liens To Be Attached To Proceeds Of Sale And (2) To Shorten Notice.  (D.E. 36).

7.      The proposed purchaser is South Florida RE. A copy of the Debtor's Agreement For Sale And Purchase Of Vacant Land was filed with the Court on August 9, 2012. (D.E. 36-1). The proposed purchase price offered is $834,435.80.

## OBJECTIONS TO THE SOUTH FLORIDA RE CONTRACT

8.      South Florida RE has not signed the contract; only the Debtor has. The SE Florida contract is riddled with objectionable terms and conditions. By was way of example, South Florida RE's inspection period may last for several months before it determines whether to proceed with the sale.

9.      The South Florida RE contract a "Purchasers Investigation" provision requiring "Phase I and Phase II environmental audits," "remediation" and a deferred closing. Even after those

events South Florida RE has the absolute right to terminate the agreement and receive a full refund of its deposit.

10.    The South Florida RE contract also contains inconsistent provisions pertaining to the closing date and the protracted inspection period. The contract states that closing will take place the "earlier" of fifteen (15) days after the dismissal of the bankruptcy or bankruptcy court of the sale" or "two hundred ten (210) days following the expiration of the Inspection Period."  (D.E. 36-1 at page 11)

11.    The SE Florida contract also proposes that" (i) the Property be leased to the Debtor for $1,200 per month; (ii) the Debtor agrees to give SE Florida a promissory note for $200,000 payable in the monthly sum of $1,000 with a three year balloon; (iii) the Debtor will give SE Florida  a mortgage on an entirely different property owned by the Debtor; and (iv) if the Debtor makes all of the monthly payments and complies with the proposed contract for sale, then the Buyer will "gift" the property back to the Debtor. The relevant provisions state:

> (vi) <u>Possession of the Property to Purchaser.</u> However, Buyer agrees to rent the church property located at 12740 S.W. 200 Street, Miami, Florida 33111 to Seller for fourteen (14) months after closing on a triple net lease (using the form of lease attached hereto as Exhibit "1") at the monthly rate of $1,200.00. Seller shall also provide adequate insurance coverages for hazard, general liability and flood, if applicable. In addition, provided Buyer may obtain a charitable gift tax deduction for same, and provided the Seller is not in breach of any of its obligations to Buyer (including the payment obligation of the $200,000 note), Buyer agrees to gift the property located at 12740 S.W. 200 Street, Miami, Florida 33111 to Seller after fourteen (14) months from closing.

> (x) <u>Seller's promissory note in favor of the Buyer for the principal sum of $200,000.</u> Seller shall execute a mortgage in favor of the Buyer on the real property located at 2880 S.W. 16 Street, Ft. Lauderdale, Florida 33312.The principal balance shall be $200,000 (plus any closing expenses that Buyer may pay for Seller, if any), and monthly interest and principal payments in the sum of

4

> $1,000.00 shall be made for three years commencing thirty days
> after closing. The mortgage shall balloon after three years…"

(D.E. 36-1 Agreement For Sale And Purchase Of Vacant Land at p. 12).

## CHURCH MORTGAGE'S PROPOSED
## REAL ESTATE PURCHASE AND SALE AGREEMENT

12.    On August 13, 2012 Church Mortgage presented the Debtor's counsel with a separate Real Estate Purchase And Sale Agreement signed by a representative of Church Mortgage. A copy of the executed Church Mortgage Real Estate Purchase And Sale Agreement is attached as Exhibit "A."

13.    Church Mortgage's Real Estate Purchase And Sale Agreement is for a higher purchase price of $875,000, with a faster closing date, without the multiple contingencies (i.e. "environmental audits") contained in the South Florida RE contract.

14.    The Church Mortgage Real Estate Purchase and Sale Agreement is comparable a proposed sale being made by the Debtor to a third party on an unrelated parcel of property. The Debtor has entered into a purchase and sale contract with Iglesia Evangelica Mision Centroamericana Alfa & Omega for real property located at 623 SW 1st Avenue, Homestead, Florida 33030. (D.E. 32 – Debtor's Motion To Sell Real Property and Approve Bidding Procedures).

15.    To date the Debtor has not replied or indicated whether it will even present Church Mortgage's Real Estate Purchase and Sale Agreement to the Court and creditors for their consideration. The Debtor appears only to deal with South Florida RE regarding the Property.

## LEGAL ARGUMENT

Under Bankruptcy Code Section 363(b)(1), "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate". *See* 11

U.S. C. § 363(b)(1). However Section 363(f) provides that a sale "free and clear of any interest in such property of an entity other than the estate" may be approved only if –

    (1)    applicable bankruptcy law permits sales of such property free and clear of of such interest;

    (2)    such entity consents;

    (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)    such interest is in a bona fide dispute; or

    (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*See* 11 U.S.C. § 363(f).

In the instant case the Debtor has not satisfied Section 363(f). As a preliminary matter, Church Mortgage does *not* consent to the Debtor's proposed sale to South Florida RE under the terms and conditions contained in the South Florida RE proposed contract. The proposed sale will not fully satisfy the lien of Church Mortgage. (*See* Proof of Claim #3 filed by Church Mortgage dated August 24, 2012).

Church Mortgage cannot be compelled in a legal or equitable proceeding, to accept a money satisfaction of its interest unless it receives full payment. *See Richardson v. Pitt County (In re Stroud Wholesale, Inc.)*, 47 B.R. 999 (E.D.N.C. 1985), *aff'd*, 983 F.2d 1057 (4th Cir. 1993)

The Debtor has not provided any information on whether the South Florida RE contract will yield a surplus for creditors of the estate. As noted in <u>Collier Bankruptcy Manuel</u>,

> "It has long been recognized that the bankruptcy court has the power to authorize the sale of property free of liens with the liens attaching to the proceeds without the consent of the lienholder. Absent consent of the lienholder, the well established rule was that the sale should not be held if it would not produce a surplus…"

2 Alan N. Resnick & Henry J. Sommer, Collier Bankruptcy Manuel ¶ 363.05 (2010).

The Debtor has not provided evidence that the sale is for fair value and that a good business reason exists for the sale to South Florida RE. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983). (relevant factors to be considered are "the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vi any appraisals of the property, which of the alternatives of use, sale or lease of the property envisions and most importantly perhaps, whether the asset is increasing or decreasing in value.").

The Debtor has also failed to demonstrate that the sale is at arm's length, and what marketing efforts were undertaken to sell the property before entering into the South Florida RE contract. It also appears that the Debtor is selling its property as a "piecemeal substitution" for a chapter 11 plan. *See In re Collins*, 180 B.R. 447, 451 (Bankr. E.D. Va. 1995) (a relevant inquiry should be undertaken to determine "what chapter the case is filed under, whether this is a major or sole asset of the estate, whether the proposed sale is a piecemeal substitution for a plan of reorganization, and the overall benefit to the estate.)

## PRESERVATION OF RIGHT TO CREDIT BID

Church Mortgage reserves all rights to credit bid for the purchase of the Property pursuant to 11 U.S.C. § 3663(k) and under the recent decision of the United States Supreme Court in *RadLAX Gateway Hotel v. Amalgamated Bank*, 132 S. Ct. 2065 (2012).

**WHEREFORE** Church Mortgage Investors, LLC prays that the Court: (i) sustain its Objection to the Debtor's Motion (1) for Authority to Sell Real Property Free and Clear of Liens, Claims and Interests, with Liens to be Attached to Proceeds of Sale; (ii) order that the Property

be offered for public auction, subject to sale procedures approved by this Court, to the highest and best cash bidder; and (iii) such other and further relief as is equitable and just and will preserve the interests of creditors of the debtor estate.

Dated: August 27, 2012.

**I HEREBY CERTIFY that I am admitted to the Bar of the Bankruptcy Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).**

**BARBARA L. PHILLIPS, P.A.**
*Counsel for Church Mortgage Investors, LLC.*
**Ingraham Building, Suite 1139**
**25 S.E. 2nd Avenue**
**Miami, Florida  33131**
**Telephone: (305) 371-3633**
**Fax: (305) 371-3638**
**E-mail: bphillipspa@bellsouth.net**
**By: /s/ Barbara L. Phillips**
**BARBARA L. PHILLIPS, ESQ.**
**Florida Bar No. 268097**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of foregoing was served electronically via the Court's CM/ECF system electronic notice/services and via U.S. Postal Service on those parties registered on August 27, 2012.

Dated: August 27, 2012

**Notice will be electronically mailed to:**

Dora Kaufman on behalf of Creditor LPP Mortgage Ltd, f/k/a Loan Participant Partners, Ltd.
dfk@lgplaw.com, cmr@lgplaw.com,

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Douglas J Snyder on behalf of Debtor Apostolic Alliance Church of the Lord Jesus Christ, Inc.
djspa@aol.com

**Notices will be sent via U.S Postal Service**

Ally Financial
c/o Ally Servicing LLC
P.O. Box 130424
Roseville, MN 55113

CLMG Corp.
PO Box 700488
Dallas, TX 75370

Diaza Drywall
13370 SW 131 St. #103
Miami, FL 33186

Darlene Allen
2666 Highway 2
Baker, FL 32531

Hernando Diaza
20120 SW 113 Ct.
Miami, FL 33189

Florida Power & Light Co.
POB 025576
Miami, FL 33102

Internal Revenue Service
Centralized Insolvency Operation
P.O. Box 7346
Philadelphia, PA 19101-7346

Miami Dade County Code Enforcement
111 NW 1st St. #1750
Miami, FL 33128

Miami-Dade County
Building Code Support Div.
11805 SW 26th St.
Miami, FL 33175

## REAL ESTATE PURCHASE AND SALE AGREEMENT

This REAL ESTATE PURCHASE AND SALE AGREEMENT ("Agreement") is made as of the ___ day of August, 2012, by and between APOSTOLIC ALLIANCE CHURCH OF THE LORD JESUS CHRIST, INC., a Florida not-for-profit corporation ("Seller"), and Church Mortgage Investors, LLC, a Florida limited liability company ("Buyer"), with reference to the following facts:

Seller is the owner of that certain parcel of real property located in Miami-Dade County, Florida, the legal description of which is attached hereto as Exhibit A (the "Property")..

### AGREEMENT

NOW, THEREFORE, in consideration of the terms and conditions of this Agreement, and the mutual covenants herein contained, Buyer and Seller hereby agree, as follows:

**1.     Property Sale**. Seller shall sell and convey to Buyer, and Buyer shall purchase and acquire from Seller, upon and subject to the terms and conditions set forth in this Agreement, the Property.



**1.1.     Real Property**. The sale comprises the Property, together with any buildings and fixtures, excepting the Excluded Personal Property, as set forth on Exhibit B attached to this Agreement, and as provided for in Section 8.2 herein, as well as easements, appurtenances, rights, privileges, reversionary interests and improvements thereunto belonging or appurtenant to the Property; all trees, shrubbery and plants now in or on the Property; all right, title and interest of Seller in and to all alleys, ships or gores of land, if any, lying adjacent to the Property; all rights to public utilities serving the Property; all right, title and interest of Seller in and to all rights-of-way, rights of ingress or egress or other interests in, on, or to, any land, highway, street, road, or avenue, open or proposed, in, on, or across, in front of, abutting or adjoining the Property.

**2.     Purchase Price**. The purchase price to be paid by Buyer to Seller for the Property is Eight Hundred Seventy Five Thousand and No/100 Dollars ($875,000.00) (the "Purchase Price").

**3.     Payment of Purchase Price**. The Purchase Price shall be payable to Seller, as follows:

**3.1.     Earnest Money Deposit**. Upon the full execution and delivery of this Agreement (such date of full execution being called the "Effective Date"), Buyer shall deposit with the Escrow Agent (defined below), the sum of Ten Thousand and No/100 Dollars ($10,000.00) (the "Deposit"). In the event Buyer does not elect to cancel this Agreement during the Contingency Period (as defined in Section 6, then, within one business day following the expiration of the Contingency Period, (i) Buyer shall deliver to Ronald G. Baker, P.A. (the "Escrow Agent"), the additional sum of Ten Thousand and No/100 Dollars ($10,000.00) (the

1

Exhibit "A."

"Additional Deposit") (the Deposit and the Additional Deposit shall be referred to herein collectively as the "Earnest Money Deposit"). The Earnest Money Deposit shall be applied against the Purchase Price, if Closing (defined below) occurs. The Earnest Money Deposit shall be held in a non-interest bearing account by Escrow Agent.

        **3.2**    **Cash to Close**. Ronald G. Baker, P.A. shall be the "Closing Agent". On the Closing Date, Buyer shall deposit with Closing Agent the balance of the Purchase Price (after deduction of the Earnest Money Deposit and subject to prorations, credits and adjustments set forth herein). In this connection, Buyer may use, as a credit and adjustment, the amounts due to Buyer from Seller, pursuant to the Final Judgment of Foreclosure, a copy of which is attached to this Agreement as Exhibit "C".

        **4.**    **Closing Date**. The date and time at which the closing occurs is hereinafter referred to as the "Closing Date" or "Closing". Upon the terms and subject to the conditions set forth in this Agreement, the closing of the sale and purchase of the real property (the "Closing") shall take place (a) at the offices of Ronald G. Baker, P.A. at 1:00 P.M., EST within five (5) days after the Court enters the Final Sale Order or (b) at such other place and time and/or on such other date as the parties hereto may mutually agree.

        **5.**    **Title and Survey Matters**.



        **5.1.**    **Title Commitment**. Promptly after the Effective Date, Buyer shall obtain (a) a commitment for an owner's title insurance policy issued, by a national title insurance company ("Title Company") selected by Buyer describing the Property, showing all matters pertaining to the Property, listing Buyer as the prospective named insured and showing as the policy amount the total Purchase Price (the "Title Commitment") and (b) legible copies of all exceptions referenced therein (the "Title Documents"). Within 5 business days following the Effective Date, Seller shall deliver to Buyer any and all title insurance policies and title abstracts pertaining to the Property, to the extent in Seller's possession.

        **5.2.**    **Title** . At Closing, Seller shall deliver good, marketable and insurable title to the Property subject only to the permitted exceptions shown on the Title Documents.

        **6.**    **Contingency Period Defined**. As used herein, the term "Contingency Period" means a period, of time commencing on the Effective Date and ending at 5:00 p.m, (Eastern Standard Time) on the 30th day thereafter.

        **7.**    **Conditions to Buyer's Obligations**.

        **7.1.**    **Satisfaction of Conditions**. Buyer and its employees and agents shall have the right and permission from the date of this Agreement through the Closing Date (or earlier termination of this Agreement) to enter upon the Property or any part thereof (during normal business hours) for the purpose, at Buyer's cost and expense, of making all tests or studies under the provisions of this Agreement. Buyer shall provide Seller written notice no less than 48 business hours prior to any entry upon the Property by Buyer or its employees or agents for the purposes set forth in this Section 7.1, and Seller shall have the right for it and/or its

for the purposes set forth in this Section 7.1, and Seller shall have the right for it and/or its representative to be present at each inspection by Buyer, its employees or agents. Buyer agrees to indemnify and hold Seller harmless from any and all injury to any person, loss of life or property damage arising out of any willful act or negligence of Buyer or its agents or independent contractors in, connection with Buyer's investigation of the Property, excluding, however, in all events, mere discovery of existing defects or conditions affecting the Property. Without limiting the generality of the foregoing, Buyer shall promptly report any damage to the Property resulting from the inspections, investigations or audits performed by Buyer, its employees or agents under this Section 7.1. The foregoing indemnity shall survive Closing or termination of this Agreement for period of 1 year. Buyer's obligation to purchase the Property shall be subject to and contingent upon the satisfaction or waiver by Buyer of the conditions set forth below in Section 7.1.1 and 7.1.2 prior to the end of the Contingency Period.

7.1.1. **Property Inspection**. Buyer shall have the right to inspect and approve, at Buyer's sole cost and expense, the physical condition of the Property (the "Property Inspection"), which may include toxic and hazardous waste studies. A Phase II environmental study may be conducted if such is indicated by a Phase I environmental study and Seller grants written consent thereto, which consent shall not be withheld or delayed unreasonably. If Buyer determines in, its sole and absolute discretion that the Property is not suitable for Buyer's intended purposes, for whatever reason, the provisions of Section 7.2 hereof shall apply. Buyer agrees to provide Seller with a copy of its inspection, reports which shall be provided without representation or warranty by Buyer to Seller. If this transaction does not close, Seller shall be entitled to retain copies of all such reports delivered to it by Buyer.



7.1.2. **Satisfactory Performance**. Within 5 business days after the Effective Date, Seller shall deliver to Buyer, Seller's existing title policy, any environmental reports or other physical studies, property management agreements, leases and rental agreements, service contracts, leases of personal property, plans and specifications relating to the Property, certificates of occupancy for the improvements, surveys, results of soil tests or any other test results or reports, and engineering studies, but only to the extent in Seller's possession or under Seller's control. Subject to the terms of Section 7.3.2 below, Buyer shall determine and notify Seller in writing within the Contingency Period which of the foregoing leases, contracts and agreements that have terms extending beyond Closing it wishes and is able to assume as of Closing. (The term "Assumed Agreements" shall mean those leases, contracts and agreements which Buyer so elects to assume at Closing.) Buyer agrees to defend, indemnify and hold Seller harmless from and against any and all losses, claims, expenses and liabilities (including. attorneys' fees and costs) arising from of relating to performance required after Closing under the Assumed Agreements. Seller agrees to defend, indemnify and hold Buyer harmless from and against any and all losses, claims, expenses and liabilities (including attorneys' fees and costs) arising from or relating to performance required prior to Closing under the Assumed Agreements. The foregoing indemnities shall, survive Closing. If Buyer determines in its sole discretion that the potential future performance of the Property for Buyer's purposes is not satisfactory to Buyer, then the provisions of Section 7.2 hereof shall apply.

7.2. **Buyer's Right to Terminate**. In the event that Buyer's conditions set forth in Sections 7.1.1 through 7.1.2 above are not satisfied or if Buyer is not satisfied with the

3

Property for any reason, Buyer at its sole discretion shall have the right to terminate this Agreement by written notice to Seller (such notice referred, to as a "Termination Notice"), such Termination Notice to be delivered to Seller by no later than the last day of the Contingency Period. If Buyer gives its Termination Notice to Seller before the expiration of the Contingency Period, the Escrow Agent shall disburse the Earnest Money Deposit to Buyer, and this Agreement shall terminate, in which case, upon disbursement by the Escrow Agent as provided herein, neither Buyer nor Seller shall have any further liability to the other under this Agreement (except for the indemnity and repair obligations contained in Section 7.1). Furthermore, should Buyer timely give a Termination Notice to Seller prior to the end of the Contingency Period, Buyer shall promptly return the Delivered Materials to Seller prior to the Escrow Agent's disbursement of the Earnest Money Deposit to Buyer. If Buyer fails to timely give its Termination Notice prior to the expiration of the Contingency Period, Buyer shall be deemed to have waived its right of termination of this Section 7.2.

**7.3.   Conditions Precedent.** Buyer's obligation to consummate this transaction is expressly conditioned upon the matters set forth in this Section 7.3. In the event that all of the conditions precedent are not satisfied or waived in writing by Closing, in addition to any other remedy Buyer may have for the failure of such condition as expressly provided herein, Buyer may terminate this Agreement and receive a return of the Earnest Money Deposit free of any claims by Seller or any other party with respect thereto.

**7.3.1. Accuracy of Representations.** Each of the representations and warranties made by Seller in this Agreement will be true and correct in all material respects on the Closing Date as if made on and as of such date.



**7.3.2. Operating Agreements.** Seller, without cost to Buyer, shall terminate at Closing all service contracts and operating agreements to the extent any relates to the Property except the Assumed Agreements. If Seller intends to keep in effect after Closing any leases, contracts or agreements that Buyer does not agree to assume, then, at Closing, Seller shall deliver to Buyer an agreement that identifies each such lease, contract and agreement and confirms that Seller shall cause each such lease, agreement and contract to be terminated prior to the end of the term of the Lease at no cost to Buyer. Notwithstanding anything contained herein, Buyer shall not have the right to assume those leases, contracts or agreements which Seller elects to keep in effect subsequent to the Closing Date, provided that (i) Seller shall indemnify and hold Buyer harmless from and against any damage, claim, cost and expense associated with the continuation of any such lease, contract or agreement and (ii) Buyer may assume such lease, contract or agreement upon the Closing Date.

**7.3.3. Seller's Performance.** Seller shall have performed, in all material respects, all covenants, agreements and undertakings of Seller contained in this Agreement.

**8.   Condition of Property.**

**8.1.   "AS-IS"/Representations.** Buyer, upon Closing, accepts the Property and improvements thereon in "AS IS" condition, WITH ALL FAULTS, subject only to the express representations and warranties made in this Agreement.   EXCEPT AS EXPRESSLY SET

4

FORTH HEREIN, SELLER DOES HEREBY DISCLAIM ANY AND ALL, AND MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY KIND TO BUYER, INCLUDING, WITHOUT LIMITATION, RELATING TO THE PHYSICAL CONDITION OF THE PROPERTY, HABITABILITY OR ITS SUITABILITY FOR ANY PARTICULAR PURPOSE.

       **8.2.** **Removal of Excluded Personal Property**. By no later than the Closing Date, Seller shall, at Seller's sole cost and expense, remove the Excluded Personal Property, provided Seller repairs any resulting damage occasioned thereby to the affected areas of the Property. Furthermore, Seller shall, at its sole cost and expense, repair any resulting damage occasioned by all such removals. The terms of this Section 8.2 shall survive Closing.

       **9.** **Seller's Representations**. Seller hereby makes the following representations, which shall be remade by Seller as of Closing as a condition of Closing, and shall survive Closing as contemplated in this Section 9:

       **9.1.** **Option to Acquire Property**. Except as set forth on Exhibit 9.1, no person or entity has any right of first refusal or option to acquire any interest in the Property or any part thereof, and Seller has not sold or contracted to sell the Property or any portion thereof or interest therein other than as set forth herein. Notwithstanding the foregoing, during the Contingency Period, and the Approval Period as hereinafter defined, Seller shall have the right to continue marketing the Property for sale, and may solicit back-up offers from other prospective purchasers should Buyer not close on the purchase of the Property. However, any back-up offers accepted shall not serve to preempt Buyer's rights under this Agreement.



       **9.2.** **Foreign Person**. Seller is not a foreign person and is a "United States Person" as such term is defined in Section 7701(a) (30) of the Internal Revenue Code of 1986, as amended (the "Code") and shall deliver to Buyer prior to Closing an affidavit evidencing such fact and such other documents as may be required under the Code.

       **9.3.** **Sole Legal Owner**. Seller is the sole legal fee owner of the Property, and is not holding fee title as a nominee for any other person or entity. Seller is authorized to enter into this Agreement, to sell the Property, and to perform its obligations under this Agreement, and the person signing this Agreement on behalf of Seller has been authorized to do so.

       **9.4.** **Litigation**. Except as set forth on Exhibit 9.4, there is no litigation of administrative action or, to Seller's knowledge, threatened litigation that would adversely affect the Property.

       **9.5.** **Taxes and Assessments**. Seller has not filed, and has not retained anyone to file, notices of protests against, or to commence action to review, real property tax assessments against the Property. To the best of Seller's knowledge, Seller has not received any notice of any special assessments of any, nature pending or being contemplated with respect to the Property, or any part thereof.

**9.6.**   **Employees.** Seller has no employees to whom by virtue of such employment Buyer will have any obligation after Closing. Seller is not a party to any collective bargaining agreement or employment agreement with respect to any of the Property, and there is not pending or threatened any labor dispute or controversy with respect to any of the Property,

**9.7.**   **Hazardous Substances.** Seller has not received written notice that the Property is in violation of any Environmental Laws. The term "Environmental Laws" means any federal, state or local law, ordinance, code, regulation, rule, order or decree regulating, relating to or imposing liability or standards of conduct concerning, any environmental conditions, health or industrial hygiene, including without limitation, (i) chlorinated solvents, (ii) petroleum products or by-products, (iii) asbestos, (iv) polychlorinated biphenyls, and (v) anything that would be a hazardous waste, material or substance, toxic substance or pollutant, as defined under the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C., 9601 et. seq.; Hazardous Materials Transportation Act, 49 U.S.C. 1801 et. seq.; Resource Conservation and Recovery Act, 42 U.S.C. 6901 et. seq., the Clean Water Act, 42 U.S.C. 1251 et, seq., any applicable state or local environmental statute, and the regulations promulgated thereunder.

**9.8.**   **Unrecorded Documents.** Seller has not, nor to the best of Seller's knowledge or belief has any predecessor in title, executed or caused to be executed any unrecorded document with or for the benefit of any governmental authority restricting the development, use or occupancy of the Property that has not specifically been disclosed to Buyer.



**9.9.**   **Additional Commitments.** Seller has made no commitments to the best of Seller's knowledge to any governmental authority, utility company, school board, church or other religious body, or any homeowner's association, or to any other organization, group or individual relating to the Property which would impose an obligation upon Buyer or its successors or assigns to make any contributions or dedications of money or land or to construct, install, or maintain any improvements of a public or private nature on or off the Property; and no governmental authority has imposed any requirement that any developer of the Property pay directly or indirectly any special fees or contributions or incur any expenses or obligations in connection with any development of the Property or any portion thereof (except as relates to fire pump maintenance, standard fees such as, impact fees, hookup, fees and similar charges).

The representations and warranties made in this Agreement by Seller and Buyer shall be continuing and shall be made by Seller and Buyer as of the Closing Date, with the same force and effect as if made on, and as of, such date. All representations and warranties made in this Agreement by Seller shall survive Closing for a period of 1 year. Furthermore, to the extent any representation of Seller is qualified to its knowledge, such representation shall be limited to the actual knowledge of Hernando Diaza, who, Seller represents, is the president of Seller and has the most knowledge of all officers and employees of Seller relating to such represented matters.

**10.**   **Buyer's Representations.** Buyer represents as follows:

6

a. Buyer has authority to enter into and perform its obligations under this Agreement.

b. In connection with any inspections, Buyer shall not unreasonably interfere in a material manner with Seller's business operations.

c. If this Agreement is terminated for any reason, (i) Buyer shall promptly return to Seller all materials furnished by Seller to Buyer pursuant to Section 7.1.2, (ii) Buyer shall promptly restore the Property to substantially the same condition in which it existed immediately prior to any physical tests conducted by or on behalf of Buyer, and (iii) before and after any such termination, Buyer shall keep all information learned by Buyer in connection with the Property or any operation thereof confidential, provided, however, Buyer may share such information with (x) its agents, professional, representatives and contractors, so long as each of same agrees to keep all such information confidential and (y) as required by applicable law or court order.

d. Buyer's representation under this Section 10 shall survive Closing or any termination of this Agreement for a period of 1 year.

11. **Covenants of Seller**. Seller covenants and agrees as follows:

11.1. **Operation of Property**. From the Effective Date to the Closing Date, Seller will continue to operate, maintain and insure the Property in the manner of a prudent owner similarly situated, in the ordinary course of its business and in compliance with all, applicable laws. Seller shall maintain the condition of the Property, in at least the condition existing on the Effective Date, ordinary wear and tear excepted.



11.2. **Encumbrances**. From the Effective Date to the Closing Date, Seller shall not enter into any leases, trust deeds, mortgages, restrictions, encumbrances, liens, licenses or other instruments or agreements affecting the Property without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, provided that all such matters are terminated prior to the Closing Date; except that Buyer's consent shall not be required relative to any lease, instrument or agreement that Seller deems necessary for the operation of its business upon the Property.

12. **Closing Procedure**.

12.1. **Time and Place of Closing**. Provided that all the contingencies set forth in this Agreement have been previously fulfilled, Closing shall take place at the place and time determined as set forth in Section 4 of this Agreement.

12.2. **Documents to be Delivered by Seller**. Seller shall obtain and deliver to Buyer at Closing the following documents (all of which shall be duly executed and acknowledged where required):

7

C:\My Documents\REAL ESTATE\CLIENTS MATTERS\Church\Second Revised Contract.doc

liens, encumbrances, conditions, easements, assignments, and restrictions, except for the Permitted Exceptions.

                **12.2.2.**      **Seller's Affidavit**. An affidavit by Seller sufficient to delete the "gap" and standard exceptions contained in the Title Commitment and addressing such other matters as are reasonably requested by the title underwriter.

                **12.2.3.**      **Nonforeign Affidavit**. An affidavit by Seller confirming that Seller is not a foreign person within the meaning of 26 U.S.C. Section 1445 and the regulations issued thereunder.

                **12.2.4.**      **Bill of Sale** . A bill of sale.

                **12.2.5.**      **Representations and Warranties Certificate**. An updated certificate executed by Seller remaking and reaffirming all representations and warranties made by Seller to Buyer in Section 9.

                **12.2.6.**      **Original Documents**. Originals within Seller's possession of all items enumerated in Section 7.1.2. of this Agreement.

                **12.2.7.**      **Closing Statement**. A closing statement for the transaction (the "Closing Statement").



                **12.2.8.**      **Assignment of Rights, etc**. An assignment of rights, warranties, licenses, permits and other intangible rights.

Seller will also execute and deliver or obtain for delivery to the Closing Agent any other instruments reasonably necessary to consummate this Agreement, including, by way of example, releases, evidence of the authority of the party executing instruments on Seller's behalf and delivery of any instruments reasonably required by the Title Company under the Title Commitment and such other instruments and documents as Buyer may reasonably require after closing.

         **12.3.  Delivery of Possession.** Delivery of Property; Cooperation; Calculation of Time. Possession of the Property shall be delivered to Buyer at Closing. Seller and Buyer shall execute such additional documentation as may be reasonably required to effectuate the intent of this Agreement including ant documents required by the Title Company to close the transaction or issue the Title Policy. At any time and from time to time after the Closing. Seller shall, at the reasonable request of Buyer and at Seller's expense and without further consideration, execute and deliver any further deeds, bills of sale, endorsements, assignments and other instruments of conveyance and transfer, and take such other actions as Buyer may reasonably request in order to more effectively transfer, convey, assign and deliver to Buyer, and to place Buyer in actual possession and operating control of, and to vest, perfect or confirm, of record or otherwise, in Buyer all right, title and interest in and to the Property. In the event the final date of any time period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday, in such event, such time period shall be extended to the next regular business day.

8

        **12.4.** **Payment of Costs and Special Assessments**. At Closing, Seller and Buyer shall pay their own respective costs incurred with respect to the consummation of the purchase and sale of the Property including, without limitation, attorneys' fees. Notwithstanding the foregoing, Seller shall pay the documentary stamp tax and surtax associated with the sale and recording of the Deed, and the cost of the preparation of the Title Commitment. Buyer shall pay the premium for an owner's standard title insurance policy issued pursuant to the Title Commitment; the cost of the Survey; any additional premiums for title insurance endorsements or extended coverage; all costs and expenses incurred relative to the Property Inspection; and all costs of Buyer's financing, including lender's title insurance premium, if any. All real property taxes and assessments, surface water management charges and similar fees or charges, and other expenses and revenues of the Property shall be prorated as of the Closing Date. After Closing, Buyer and Seller shall reconcile the actual amount of revenues or liabilities upon, receipt or payment thereof to the extent those items were prorated or credited at Closing based upon estimates, including reconciliation of real estate and personal property taxes upon issuance of the tax, bill, for the year in which Closing occurs. The provisions of this Section 12 shall survive Closing.

        Seller shall pay in full at or prior to Closing all special assessments which are a lien on the Real Property as of the date of Closing and have been assessed or accrued prior to the Closing. Buyer shall pay all other special assessments or installments not payable by Seller which are assessed or accrue after Closing.



        **12.5.** **Final Sale Order.** If Buyer is ultimately approved by the Bankruptcy Court, the Final Sale Order will be reasonably acceptable to Buyer and Seller and will, among other things, (i) approve the sale of the Property to Buyer on the terms and conditions set forth in this Agreement and as otherwise acceptable to Buyer on the terms and conditions set forth in this Agreement and as otherwise acceptable to Buyer and authorize the Seller to proceed with and consummate this transaction; (ii) include a specific finding that Buyer is a good faith purchaser of the Property as that term is contemplated by 11 U.S.C. Section 363(m) and afforded all of the protections of such a finding and that all due and adequate notice has been provided; (iii) state that the sale of the Property to Buyer shall be free and clear of all Liens, Claims, and Interests; (iv) provide that Buyer shall not be deemed a successor to Seller; (v) state that the stay generally imposed by Rule 6004 of the Federal Rules of Bankruptcy Procedure be waived such that the Final Sale Order is an unstayed and effective order.

        **13.** **Condemnation**. In the event of any commenced, to be commenced or consummated proceedings in eminent domain or condemnation (collectively, "Condemnation") respecting the Property or any portion thereof prior to Closing, Buyer may elect, by written notice delivered to Seller prior to the Closing Date, to terminate this Agreement and the escrow created pursuant hereto and be relieved of its obligation to purchase the Property. If Buyer makes such election, the Earnest Money Deposit and other sums delivered to Escrow Agent by Buyer promptly shall be returned to Buyer and neither Buyer nor Seller shall have any further liability to the other, and shall be relieved of all obligations hereunder (except for the indemnity and repair obligations contained in Section 7.1). If Buyer fails to make such election prior to the Closing Date, this Agreement shall continue in effect, there shall be no reduction in the Purchase

and repair obligations contained in Section 7.1). If Buyer fails to make such election prior to the Closing Date, this Agreement shall continue in effect, there shall be no reduction in the Purchase Price, and Seller shall, prior to the Closing Date, assign to Buyer Seller's entire right, title and interest in and to any condemnation award or settlement made onto be made in connection with such Condemnation proceeding (except any award relating to either the Excluded Personal Property or the loss or negative impact upon Seller's business operations as distinguished from the loss of land which, shall in no event diminish the award otherwise payable to Buyer), in which case Buyer shall have the right at all times to participate in all negotiations and dealings with the condemning authority and approve or disapprove any proposed settlement in respect to such matter (other than those relating to the Excluded Personal Property or the loss or negative impact upon Seller's business operations). Seller shall promptly notify Buyer in writing of any such Condemnation respecting the Property.

      **14.**   **Casualty.** If any fire, earthquake, windstorm or other casualty occurs and materially affects all or any portion of the Property on or after the date of this Agreement and prior to Closing Buyer may elect by written notice delivered to Seller within twenty (20) days after such casualty (but, in no event later than the Closing Date), to terminate this Agreement and the escrow created pursuant hereto and be relieved of its obligation to purchase the Property. The phrase "materially affects" shall mean any damage to the Property, the cost of which to repair or replace exceeds $500,000. If Buyer makes such election, the Earnest Money Deposit and other sums delivered to Escrow Agent by Buyer promptly shall be returned to Buyer and neither Buyer nor Seller shall have any further liability to the other and shall be relieved of all obligations hereunder (except for the indemnity and repair obligations contained in Section 7.1). If either Buyer fails to make such election prior to the earlier of the Closing Date or 20 days following such casualty or the cost to repair damage is less than $500,000, this Agreement shall continue in effect, the Purchase Price shall be reduced by the amount of loss or damage occasioned by such casualty not covered by insurance, and Seller shall, at or prior to the Closing Date, assign to Buyer Seller's entire right, title and interest in and to all insurance claims and proceeds to which Seller may be entitled, in connection with such casualty (other than business interruption insurance and insurance relating to the Excluded Personal Property), in which case Buyer shall have the right at all times to participate in all negotiations and other dealings with the insurance carrier providing such coverage and to approve or disapprove any proposed settlement in respect to such matter. Seller shall promptly notify Buyer in writing of any such casualty respecting the Property (other then those matters relating to business interruption insurance or the Excluded Personal Property). To the extent the cost to repair is less than $500,000, Seller may elect to cause the damage to be repaired at its sole cost and expense in a good and workmanlike manner and the Purchase Price shall not be reduced at Closing. Closing shall not be extended to enable Seller to complete the repairs; but instead Seller shall cause the repairs to be completed promptly following Closing, and monies shall be escrowed at Closing (at 125% of estimated repair cost) at time of Closing as security to Buyer that Seller will timely complete repairs.

      **15.**   **Notices.** Unless applicable law requires a different method of giving notice, any and all notices, demands or other communications required or desired to be given hereunder by any party (collectively, "notices") shall be in writing and shall be validly given or made to another party if delivered either personally, by facsimile, or by Federal Express or other



C:\My Documents\REAL ESTATE\CLIENTS MATTERS\Church\Second Revised Contract.doc

overnight delivery service of recognized standing, or by United States Mail, certified, registered, or express mail with postage prepaid. If such notice is delivered in person or by facsimile, it shall be conclusively deemed given at the time of such delivery. If such notice is delivered by Federal Express or other overnight delivery service of recognized standing, it shall be deemed given 24 business hours, after the deposit thereof with such delivery service. If such notice is mailed as provided herein, such shall be deemed given 48 business hours after the deposit thereof in the United States Mail. Each such notice shall be deemed given only if properly addressed to the party to whom such notice is to be given as follows:

|  |  |
|---|---|
| To Seller: | Apostolic Alliance Church of the Lord Jesus Christ, Inc. |
|  | P.O. Box 971114 |
|  | Miami, Florida 33197 |
|  | Attn: Pastor Hernando Diaza, President |

|  |  |
|---|---|
| with a copy to: | Douglas J. Snyder, P.A. |
|  | 7901 SW 67th Ave., Suite 206 |
|  | South Miami, Florida 33143-4538 |

|  |  |
|---|---|
| To Buyer: | Church Mortgage Investors, LLC |
|  | 2801 Florida Ave. |
|  | Suite 15 |
|  | Miami, FL 33133 |
|  | Attn: Farid Chehab |

|  |  |
|---|---|
| wiht a copy to: | Ronald G. Baker, P.A. |
|  | Gables International Plaza |
|  | 2655 JeJeune Road, Suite PH-2-B |
|  | Coral Gables, Florida 33134 |



Any party hereto may change its address for the purpose of receiving notices as herein provided by a written notice given in the manner aforesaid to the other patty hereto.

### 16.    Zoning Use.

church.
The Seller represents that the zoning currently permits the use of the property as a

### 17.    Miscellaneous.

**17.1.** **Applicable Law**. This Agreement shall in all respects be governed by the laws of the State of Florida.

**17.2.** **Further Assurances**. Each of the parties shall execute and deliver any and all additional papers, documents and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of its obligations hereunder, to carry out the intent of the parties hereto.

**17.3.** **Modification or Amendment**. No amendment, change or modification of this Agreement shall be valid, unless in writing and signed by all parties hereto.

**17.4** **Successors and Assigns**. Buyer may not assign this Agreement without Seller's written consent, which consent Seller may withhold in its sole discretion. Notwithstanding the foregoing, Buyer shall have the right to assign this Agreement without the consent of Seller to any affiliate of Buyer, provided (i) Buyer is not released from its obligations hereunder and (ii) Buyer notifies Seller of the identity of such assignee no less than 2 business days prior to Closing. All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns.

**17.5.** **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or, representations with respect to its subject matter are hereby canceled in their entirety and are of no further force or effect.



**17.6.** **Attorneys' Fees**. Should either party bring suit to enforce this Agreement, the prevailing party in such lawsuit shall be entitled to an award of its reasonable attorneys' fees and costs incurred in connection with such lawsuit.

**17.7.** **Headings**. The captions and paragraph headings used in this Agreement are inserted for convenience of reference only and are not intended to define, limit or affect the interpretation or construction of any term or provision hereof.

**17.8.** **Radon Gas Notice**. Pursuant to Florida Statutes Section 404.056(8), Seller hereby makes, and Buyer hereby acknowledges, the following notification:

> RADON GAS: Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

**17.9.** **Time**. Time is of the essence in the execution and performance of this Agreement.

**17.10. Counterparts.** This Agreement may be signed in counterparts which, when taken together, shall constitute the complete agreement. The parties agree to accept facsimile or electronically transmitted signatures as originals for the execution of this Agreement.

**17.11. Escrow Terms.** The Earnest Money Deposit shall be held by Escrow Agent on the following terms and conditions:

(i)     Escrow Agent shall deliver the Earnest Money to Seller or Buyer, as the case may be, in accordance with the provisions of this Agreement. Escrow Agent shall deposit the funds into a non-interest bearing trust account with a national banking association or other bank acceptable to Seller and Buyer. Buyer's Federal Identification Number for purposes of this Agreement is 27-5491915.

(ii)    Any notice to or demand upon Escrow Agent shall be in writing and shall be sufficient only if received by Escrow Agent within the applicable time periods set forth herein if any. Notices to or demands upon Escrow Agent shall be mailed to Ronald G. Baker, P.A., 2655 LeJeune Road, Suite PH-2-B, Coral Gables, FL 33134, or served personally upon Escrow Agent with receipt acknowledged in writing by Escrow Agent. Notices from Escrow Agent to Seller or Buyer shall be mailed to them at the addresses for each party shown in Section 15 of this Agreement.



(iii)   In the event that litigation is instituted relating to this escrow, the parties hereto agree that Escrow Agent shall be held harmless from any attorneys' fees, court costs and expenses relating to that litigation to the extent that litigation does not arise as a result of the Escrow Agent's fault. In the event that conflicting demands are made on Escrow Agent, or Escrow Agent, in good faith, believes that any demands with regard to the Earnest Money Deposit are in conflict or are unclear or ambiguous, Escrow Agent may bring an interpleader action in an appropriate court. Such action shall not be deemed to be the "fault" of Escrow Agent. The parties hereto, other than Escrow Agent, agree to indemnify Escrow Agent for all such attorneys' fees, court costs and expenses. Escrow Agent may use a portion of the funds for the Clerk's filing fee.

(iv)    Without limitation, Escrow Agent shall not be liable for any loss or damage resulting from the following: (a) the financial status or insolvency of any other party, or any misrepresentation made by any other party; (b) any legal effect, insufficiency or undesirability of any instrument, deposited with or delivered by or to Escrow Agent or exchanged by the parties hereunder, whether or not Escrow Agent prepared such instrument; (c) the default, error, action or omission of any other party to this Agreement or any actions taken by Escrow Agent in good faith, except for Escrow Agent's gross negligence or willful misconduct; (d) any loss or impairment of the Earnest Money Deposit that has been deposited in escrow while the Earnest Money Deposit is in the course of collection or while the Earnest Money Deposit is on deposit in a financial institution if such loss or impairment results from the failure, insolvency or suspension of a financial institution, or any loss or impairment of the Earnest Money Deposit due to the invalidity of any draft, check, document or other negotiable instrument delivered to Escrow Agent; (e) the expiration of any time limit or other consequence of delay, unless a

13

settlement instruction executed by both Seller and Buyer, accepted by Escrow Agent, has instructed the Escrow Agent to comply with said time limit; and (f) Escrow Agent's compliance with any legal process, subpoena, writ, order, judgment or decree of any court, whether issued with or without jurisdiction and whether or not subsequently vacated, modified, set aside or reversed.

(v)     Escrow Agent shall not have any duties or responsibilities, except those set forth in this Section and shall not incur any liability in acting upon any signature, notice, demand, request, waiver, consent, receipt or other paper or document believed by Escrow Agent, in good faith, to be genuine. Escrow Agent may assume that any person purporting to give it any notice on behalf of any party in accordance with the provisions hereof has been duly authorized to do so, or is otherwise acting, or failing to act under this Section except in the case, of Escrow Agent's gross negligence or willful misconduct.    Upon completion of the disbursement of the Earnest Money Deposit, Escrow Agent shall be automatically released and discharged of its escrow obligations hereunder.

(vi)     The terms and provisions of this Article shall create no right in any person, firm or corporation other than the parties and their respective successors and permitted assigns and no third party shall have the right to enforce or benefit from the terms hereof.

(vii)     Escrow Agent has executed this Agreement for the sole purpose of agreeing to act as such in accordance with the terms of this Agreement.



### 17.13.  Omitted

**17.14.  Interpretation.** The preparation of this Agreement has been a joint effort of the parties and the resulting documents shall not, solely as a matter of judicial construction, be construed more severely against one of the parties than the other. This Agreement may be executed in counterparts, each of which shall constitute an original and all which taken together shall constitute a single agreement. Electronic of fax copies of this Agreement shall be treated as an original counterpart. This Agreement constitutes the entire agreement of Buyer and Seller relating to the Real Property and there are no representations, oral or written, with respect thereto which have not been incorporated herein. All provisions of this Agreement shall survive the Closing.

**17.15  No Brokers.** Each party represents that there are no brokers involved in connection with this Agreement or the proposed transaction. If Seller has engaged the services of a broker, Seller agrees that it shall be solely responsible for any fees, payments, obligations or commissions that are owing to the broker for any commission or similar fee by any broker by reason of the acts, and the Seller whose acts such claim is predicated shall indemnify and hold the Buyer free and harmless from and against any and all liability and expense in connection therewith.

**17.16.** **Exhibits.** The following exhibits are attached hereto and incorporated herein:

>       Exhibit A - Legal Description
>       Exhibit B - Excluded Personal Property
>       Exhibit C – Final Judgment of Foreclosure
>       Exhibit 7.4 – Litigation
>       Exhibit 9.1 – Option to Acquire Property

**18.** **Default.** If Seller fails to perform its obligations in accordance with the terms of this Agreement, or if any representations or warranty made by Seller herein shall be untrue in all material respects upon execution hereof or on the Closing Date, then Buyer may (a) terminate this Agreement and receive a return of the Deposit, or (b) close the purchase of the Property. If Buyer fails to perform its obligations in accordance with the terms of this Agreement, then Seller may terminate this Agreement and retain the Deposit, as liquidated damages and not as a penalty. Provided however that the termination of this Agreement shall not constitute a waiver of any and all rights of Buyer pursuant to its Final Judgment of Foreclosure dated February 22, 2012 in Church Mortgage Investors, LLC v. Apostolic Alliance Church of the Lord Jesus Christ, Inc. et al, Case No. 11-37672 CA 31, Miami Dade County, Florida.

:

Apostolic Alliance Church of the Lord Jesus Christ, Inc.

BY: _____

        Pastor Hernando Diaza, President

BUYER:
CHURCH MORTGAGE INVESTORS, LLC

BY:

FARID CHEHAB, Manager

Exhibit A

<u>Legal Description</u>



C:\My Documents\REAL ESTATE\CLIENTS MATTERS\Church\Second Revised Contract.doc

(Folio Numbers 3069110010010 and

3069110010011) located at 12720-40 S.W. 200th Street, Miami, Florida 33177-4818 with the

following legal description:

A portion of Lot 1 in TROPICO SUBDIVISION as recorded in Plat Book 2, at
Page 57 of the Public Records of Dade County, Florida, and more particularly
described as follows:

From the Northeast corner of Lot 1, which is the Point of Beginning, in
TROPICO SUBDIVISION, run Westerly along the North line of said Lot 1,
241.69 feet to a point, said line also being the North line of the Northeast Quarter
(NE ¼) of Section 11, Township 56 South, Range 39 east; thence run Southerly
along a line parallel to the East line of said Lot 1 229.00 feet to a point; thence at
an interior angle of 90 degrees, 30 minutes, 45 seconds, run Easterly 24.69 feet to
a point on the East line of said Lot 1; thence at an interior angle of 89 degrees, 29
minutes, 15 seconds run Northerly 228.90 feet along the East line of said Lot 1 to
the point of beginning, less the North and East 35 feet thereof for road purposes,
said lands containing 0.92 acres more or less, lying and being in the Northeast
Quarter (NE ¼) of Section 11, Township 56 South, Range 39 East, Dade county,
Florida.



AND

From the Northeast Corner of Lot 1, in TROPICO SUBDIVISION, run Southerly
along the East line of said Lot 1 228.90 feet to the Point of Beginning, said line
also being the East line of the NE ¼ of Section 11, Township 56 South, Range 39
East; thence continue and run Southerly along the East line of said lot 1 for a
distance of 180.21 feet to a a point; thence at an interior angle of 89 degrees, 30
minutes, 34 seconds run Westerly 241.69 feet to a point; thence at an interior
angle of 89 degrees, 30 minutes, 34 seconds run Westerly 241.69 feet to a point;
thence run Northerly along a line parallel to the East line of said Lot 1, for a
distance of 180.21 feet to a point; thence at an interior angle of 89 degrees, 30
minutes, 34 seconds run Westerly 241.69 feet to a point; thence run Northerly
along a line parallel to the East line of said Lot 1, 180.30 feet to a point; thence at
an interior angle of 89 degrees, 29 minutes, 15 seconds run Easterly 241.69 feet to
the Point of Beginning, less the East 35 feet thereof for road purposes, said land
containing 0.86 acre, more or less, lying and being in the NE ¼ of Section 11,
Township 56 South, Range 39 East, Dade County, Florida.

AND

A portion of Lots 1 and 2 in TROPICO SUBDIVISION, as recorded in Plat Book 2, at Page 57, of the Public Records of Dade County, Florida more particularly described as follows: From the Northeast corner of Lot 1 in TROPICO SUBDIVISION, run Westerly along the North line of said Lot 1, 241.69 feet to the Point of Beginning said line also being the North line of the North East ¼ of Section 11, Township 56 South, Range 39 East; thence run Southerly along a line parallel to the East line of said lot 1, 204.65 feet to a point; thence run northerly along a line parallel to the East line of said lot 1, 204.65 feet to a point; thence at an interior angle of 89° 28' 54" run westerly 212.84 feet to a point; thence run northerly along a line parallel to the East line of said Lot 1, 204.76 feet to a point; thence at an interior of 89° 27' 15" run easterly 212.84 feet along the North line of said Lots 1 and 2 to the Point of Beginning, less the North 35 feet thereof for road purposes, said land containing 0.82 acres more or less lying and being in the Northeast ¼ of Section 11, Township 56 South, Range 39 East Dade County, Florida.



From the Northeast corner of Lot 1 in TROPICO SUBDIVISION, run Westerly along the North line of said Lot 1, 241.69 feet to a point, said line also being the North line of the Northeast ¼ of Section 11, Township 56 South, Range 39 East; thence run Southerly along a line parallel to the East line of said Lot 1, 204.65 feet to a point; thence at an interior angle of 89° 30' 34"run Westerly 212.84 feet to a point; thence at an interior angle of 90° 29' 26" run Northerly 204.76 feet to a point; thence run Easterly 212.84 feet to the Point of Beginning said land containing 1 acre more or less lying and being in the Northeast ¼ of Section 11, Township 56 South, Range 39 East, Dade County, Florida.

Exhibit B

Excluded Personal Property

None.



C:\My Documents\REAL ESTATE\CLIENTS MATTERS\Church\Second Revised Contract.doc

Exhibit C

<u>Final Judgment of Foreclosure</u>



C:\My Documents\REAL ESTATE\CLIENTS MATTERS\Church\Second Revised Contract.doc

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA GENERAL JURISDICTION DIVISION

CASE NO: 11-37672 CA 31

CHURCH MORTGAGE INVESTORS, LLC,
a Florida corporation,

     Plaintiff,

vs.

APOSTOLIC ALLIANCE CHURCH
OF THE LORD JESUS CHRIST, INC.,
a Florida non-profit corporation,
HERNANDO DIAZA, and
MIAMI-DADE COUNTY, a municipal
Corporation,

     Defendants.
_____/



## FINAL JUDGMENT OF FORECLOSURE
(Pursuant to Administrative Order 09-09)

     **THIS ACTION** was heard before the Court on Plaintiff's Motion for Summary Final Judgment on February 22, 2012. On the evidence presented,

     **IT IS ORDERED and ADJUDGED that:**

     1.    The Plaintiff's Motion for Summary Judgment is GRANTED. Service of process has been duly and regularly obtained over each of the defendants, i.e., APOSTOLIC ALLIANCE CHURCH OF THE LORD JESUS CHRIST, INC. ("Apostolic Alliance"), HERNANDO DIAZA ("Mr. Diaza"), and MIAMI-DADE COUNTY ("MDC")

     2.    **Amounts Due.** There is due and owing to the plaintiff, Church Mortgage Investors, LLC, by Apostolic Alliance and Mr. Diaza under the terms of that certain promissory note dated July 28, 2005, the amounts set forth in subparagraphs (A) through (C) below:

A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

2                              CASE NO: 11-37672 CA 31

*(A)*    ***Principal and Interest***

Principal amount secured by the mortgage foreclosed:    700,000.00
Unpaid interest from 6/1/11 to 7/15/11 at 10.5%         8,860.27
Interest at highest legal rate from 7/16/11 to 2/22/12  105,958.45[1]

                                                        **$814,818.72**

*(B)*    ***Costs (per Promissory Note):***

| Event | Date | Amount |
|-------|------|--------|
| Photocopies | 3/2/11, 9/6/11 | 52.39 |
| Investigative | 8/31/11 | 20.10 |
| Postage | 9/6/11 | 18.09 |
| Filing fee for foreclosure | 11/10/11 | 1906.00 |
| Issuance of Summonses | 11/10/11 | 30.00 |
| Services of Summonses | 11/15/11 | 215.00 |
| Courier Services | 11/15/11, 12/15/11 | 8.00 |

**Costs Subtotal:**                                     **$2,464.58**

*(C)*    ***Attorneys' Fees (per Promissory Note):***

**Attorneys' Fees:**

72 hours at blended hourly rate of $243.23        **$17,512.50**

**GRAND TOTAL:**                                        **$834,435.80**

3.      **Interest.** The grand total amount referenced in paragraph 2 shall bear interest

from this date forward at the prevailing legal rate of interest.

4.      **Lien on Property.** Plaintiff, whose address is Church Mortgage Investors, LLC,

c/o Farid Chehab, at 2801 Florida Avenue, Suite 15, Miami, Florida, 33133, holds a lien for the

grand total sum specified in Paragraph 2 herein. The lien of the plaintiff is superior in dignity to

any right, title, interest, or claim of either Apostolic Alliance or Mr. Diaza and all other persons,

corporations, or other entities claiming by, through, or under the defendants or any of them and

---

[1] The highest legal rate permitted if an "obligation exceeds $500,000" is twenty-five percent. §§ 687.02, .03, .071,
Fla. Stat. (2009). See also Bailey v. Harrington, 462 So. 2d 861, 861 (Fla. 3d DCA 1985).



A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

the property will be sold free and clear of all claims of the defendants, including, without

limitation, the Code Enforcement Lien recorded on August 10, 2011, in Official Records Book

27788, Page 3916 of the Public Records of Miami-Dade County, Florida claimed by MDC. The

plaintiff's lien encumbers the two parcels of real property (Folio Numbers 3069110010010 and

3069110010011) located at 12720-40 S.W. 200th Street, Miami, Florida 33177-4818 with the

following legal description:

> A portion of Lot 1 in TROPICO SUBDIVISION as recorded in Plat Book 2, at
> Page 57 of the Public Records of Dade County, Florida, and more particularly
> described as follows:
>
> From the Northeast corner of Lot 1, which is the Point of Beginning, in
> TROPICO SUBDIVISION, run Westerly along the North line of said Lot 1,
> 241.69 feet to a point, said line also being the North line of the Northeast Quarter
> (NE ¼) of Section 11, Township 56 South, Range 39 east; thence run Southerly
> along a line parallel to the East line of said Lot 1 229.00 feet to a point; thence at
> an interior angle of 90 degrees, 30 minutes, 45 seconds, run Easterly 24.69 feet to
> a point on the East line of said Lot 1; thence at an interior angle of 89 degrees, 29
> minutes, 15 seconds run Northerly 228.90 feet along the East line of said Lot 1 to
> the point of beginning, less the North and East 35 feet thereof for road purposes,
> said lands containing 0.92 acres more or less, lying and being in the Northeast
> Quarter (NE ¼) of Section 11, Township 56 South, Range 39 East, Dade county,
> Florida.



AND

> From the Northeast Corner of Lot 1, in TROPICO SUBDIVISION, run Southerly
> along the East line of said Lot 1 228.90 feet to the Point of Beginning, said line
> also being the East line of the NE ¼ of Section 11, Township 56 South, Range 39
> East; thence continue and run Southerly along the East line of said lot 1 for a
> distance of 180.21 feet to a a point; thence at an interior angle of 89 degrees, 30
> minutes, 34 seconds run Westerly 241.69 feet to a point; thence at an interior
> angle of 89 degrees, 30 minutes, 34 seconds run Westerly 241.69 feet to a point;
> thence run Northerly along a line parallel to the East line of said Lot 1, for a
> distance of 180.21 feet to a point; thence at an interior angle of 89 degrees, 30
> minutes, 34 seconds run Westerly 241.69 feet to a point; thence run Northerly
> along a line parallel to the East line of said Lot 1, 180.30 feet to a point; thence at
> an interior angle of 89 degrees, 29 minutes, 15 seconds run Easterly 241.69 feet to
> the Point of Beginning, less the East 35 feet thereof for road purposes, said land
> containing 0.86 acre, more or less, lying and being in the NE ¼ of Section 11,
> Township 56 South, Range 39 East, Dade County, Florida.


A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

4                                          CASE NO: 11-37672 CA 31

AND

A portion of Lots 1 and 2 in TROPICO SUBDIVISION, as recorded in Plat Book 2, at Page 57, of the Public Records of Dade County, Florida more particularly described as follows: From the Northeast corner of Lot 1 in TROPICO SUBDIVISION, run Westerly along the North line of said Lot 1, 241.69 feet to the Point of Beginning said line also being the North line of the North East ¼ of Section 11, Township 56 South, Range 39 East; thence run Southerly along a line parallel to the East line of said lot 1, 204.65 feet to a point; thence run northerly along a line parallel to the East line of said lot 1, 204.65 feet to a point; thence at an interior angle of 89° 28' 54" run westerly 212.84 feet to a point; thence run northerly along a line parallel to the East line of said Lot 1, 204.76 feet to a point; thence at an interior of 89° 27' 15" run easterly 212.84 feet along the North line of said Lots 1 and 2 to the Point of Beginning, less the North 35 feet thereof for road purposes, said land containing 0.82 acres more or less lying and being in the Northeast ¼ of Section 11, Township 56 South, Range 39 East Dade County, Florida.



From the Northeast corner of Lot 1 in TROPICO SUBDIVISION, run Westerly along the North line of said Lot 1, 241.69 feet to a point, said line also being the North line of the Northeast ¼ of Section 11, Township 56 South, Range 39 East; thence run Southerly along a line parallel to the East line of said Lot 1, 204.65 feet to a point; thence at an interior angle of 89° 30' 34"run Westerly 212.84 feet to a point; thence at an interior angle of 90° 29' 26" run Northerly 204.76 feet to a point; thence run Easterly 212.84 feet to the Point of Beginning said land containing 1 acre more or less lying and being in the Northeast ¼ of Section 11, Township 56 South, Range 39 East, Dade County, Florida.



5.      **Sale of Property:**  If the grand total amount referenced in paragraph 2 with

interest at the rate described in paragraph 3 and all costs accrued subsequent to this judgment are

not paid, the Clerk of the Court shall sell the subject property at public sale on

~~APR 2 3 2012~~, 2012, to the highest bidder for cash, except as prescribed in Paragraph 6,

at:

[  ]     Room 908, 140 West Flagler Street, Miami, Florida at 11:00 a.m.
[ X ]    www.miamidade.realforeclose.com, the Clerk's website for online auctions at 9:00 a.m.

after having first given notice as required by Section 45.031, Florida Statutes.



A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

5                    CASE NO: 11-37672 CA 31

6.    **Costs:**  Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the Clerk if plaintiff is not the purchaser of the property for sale. If plaintiff is the purchaser, the Clerk shall credit plaintiff's bid with the total sum with interest and costs accruing subsequent to this judgment, or such part of it, as is necessary to pay the bid in full. The Clerk shall receive the service charge imposed in Section 45.031, Florida Statutes, for services in making, recording, and certifying the sale and title shall be assessed as costs.

7.    **Right of Redemption:**  On filing the Certificate of Sale, defendant's right of redemption as proscribed by Florida Statutes, Section 45.0315 shall be terminated.

8.    **Distribution of Proceeds:**  On filing the Certificate of Title, the Clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of Plaintiff's costs; second, documentary stamps affixed to the certificate; third, plaintiff's attorneys' fees; fourth, the total sum due to Plaintiff, less the items paid, plus interest at the rate prescribed in paragraph 2 from this date forward to the date of the sale. During the sixty (60) days after the clerk issues the certificate of disbursements, the Clerk shall hold the surplus pending further Order of this Court.



9.    **Right of Possession:**  Upon filing of the Certificate of Title, defendant and all persons claiming under or against defendant since the filing of the Notice of Lis Pendens shall be foreclosed of all estate or claim in the property and the purchaser at sale shall be let into possession of the property, subject to the provisions of the "Protecting Tenant at Foreclosure Act of 2009."

10.   **Attorney Fees:**  The Court finds, based upon the affidavits presented and upon inquiry of counsel for the plaintiff, that seventy-two (72) hours were reasonably expended by plaintiff's counsel and that a blended hourly rate of approximately $243 is appropriate.

A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

PLAINTIFF'S COUNSEL REPRESENTS THAT THE ATTORNEY FEE AWARDED DOES NOT EXCEED ITS CONTRACT FEE WITH THE PLAINTIFF. The Court finds that there are no reduction or enhancement factors for consideration by the Court pursuant to Florida Patient's Compensation Fund v. Rowe, 472 So. 2d 1145 (Fla. 1985).

11.    **NOTICE PURSUANT TO SECTION 45.031, FLA. STAT. (Amended 2006)**



IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THIS FINAL JUDGMENT. IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN 60 DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS. IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF. YOU ARE NOT REQUIRED TO HAVE A LAWYER OR ANY OTHER REPRESENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH ARE ENTITLED. PLEASE CHECK WITH THE CLERK OF COURT FOR MIAMI DADE COUNTY, TELEPHONE NUMBER 305-375-5943, 73 WEST FLAGLER STREET, MIAMI, FLORIDA, WITHIN TEN (10) DAYS AFTER THE SALE TO SEE IF THERE IS ADDITIONAL MONEY FROM THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE COURT. IF YOU DECIDE TO SELL THE PROPERTY OR HIRE SOMEONE TO HELP YOU CLAIM THE ADDITIONAL MONEY, YOU SHOULD READ VERY CAREFULLY ALL PAPERS YOU ARE REQUIRED TO SIGN, ASK SOMEONE ELSE, PREFERABLY AN ATTORNEY WHO IS NOT RELATED TO THE



A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

7                        CASE NO: 11-37672 CA 31

PERSON OFFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND
WHAT YOU ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR
PROPERTY OR THE EQUITY IN YOUR PROPERTY WITHOUT THE PROPER
INFORMATION. IF YOU CANNOT AFFORD TO PAY AN ATTORNEY, YOU MAY
CONTACT LEGAL SERVICES OF GREATER MIAMI, INC., 305-576-0080, TO SEE IF
YOU QUALIFY FINANCIALLY FOR THEIR SERVICES. IF THEY CANNOT ASSIST
YOU, THEY MAY BE ABLE TO REFER YOU TO A LOCAL BAR REFERRAL AGENCY
OR SUGGEST OTHER OPTIONS. IF YOU CHOOSE TO CONTACT LEGAL SERVICES
OF GREATER MIAMI, INC. FOR ASSISTANCE, YOU SHOULD DO SO AS SOON AS
POSSIBLE AFTER RECEIPT OF THIS NOTICE.

        **13.    Reservation of Jurisdiction:** Jurisdiction of this action is retained to enter further

orders as are proper including, without limitation, writs of possession and the entry of a

deficiency judgment against Apostolic Alliance and Mr. Diaza.

        **DONE and ORDERED** in Miami, Florida, on the 22nd day of February, 2012.

                                                                FEB 2 2 2012

14. *sale date not to occur from 60 days of this order.*

cc:     Paul Aiello, Esq.                        ABBY CYNAMON
        Thomas H. Robertson, Esq.                Circuit Court Judge
        Jonathan R. Rubin, Esq.
                                                 ABBY CYNAMON
                                                 CIRCUIT COURT JUDGE

                    STATE OF FLORIDA, COUNTY OF DADE
                    I HEREBY CERTIFY that the foregoing is a true and correct copy of the
                    original on file in this office. _____ AD 20 _____
                    HARVEY RUVIN, Clerk of Circuit and County Courts
                                    Deputy Clerk _____

Exhibit 7.4

## Litigation

1.   Church Mortgage Investors, LLC v.
     Apostolic Alliance Church of the Lord Jesus Christ, Inc., et al.

2.   Bankruptcy Case No. 12-19619-AJC, filed April 20, 2012,
     in the Southern District of Florida



C:\My Documents\REAL ESTATE\CLIENTS MATTERS\Church\Second Revised Contract.doc

Exhibit 9.1

## Option to Acquire Property

None.



C:\My Documents\REAL ESTATE\CLIENTS MATTERS\Church\Second Revised Contract.doc